LAW OFFICES OF
# IRA D. LONGON

### AVROM ROBIN

OF COUNSEL
ROBERT M. SILVERSTEIN
BRIAN J. NEARY, NY, NJ & MA BAR

SUITE 1900
245 FIFTH AVENUE
NEW YORK, NEW YORK 10016
TEL: 212-683-8000
FAX: 212-683-9422
EMAIL: iradlondon@aol.com
avrom@mindspring.com

**BY ECF**

May 13, 2008

Honorable Victor Marrero
United States District Judge
United States Courthouse
500 Pearl Street
New York, NY 10007

     **Re:**    **United States v. Randy Hightower**
              **07 cr. 1111 (VM)**

Dear Judge Marrero:

  This letter is submitted as a reply to the government's response, dated May 2, 2008, to Mr. Hightower's motion, dated April 10, 2008, to suppress the physical evidence and statements obtained in violation of his Fourth Amendment right to be free of unreasonable search and seizure.

  Tellingly, the government never attempts to explain the initial illegality of the stop: Mr. Hightower did not match the description provided by the anonymous 911 caller, he was in a location other than the one that the anonymous caller designated and he was not behaving suspiciously.[1]

---

[1] Only yesterday, *The New York Times* reported that over the past six years in federal suppression hearings there have been "more than twenty cases in which judges found police officers' testimony to be unreliable, inconsistent, twisting the truth, or just plain false." One former federal judge stated that the unusually high number of suppressions in New York City

Honorable Victor Marrero
May 13, 2008
Page 2 of 2

      The government's sole argument is that Mr. Hightower was not seized within the meaning of the Fourth Amendment. Government's Response at 2. In arguing that Mr. Hightower was not seized because he had not submitted to police authority, the government relies on *United States v. Baldwin*, 496 F.3d 215 (2d Cir. 2007). This reliance is misplaced, however. While *Baldwin* does make clear that "'there is no seizure without actual submission,' . . . [w]hether conduct constitutes submission to police authority will depend . . . on the totality of the circumstances – the whole picture." *Id.* at 219 (quoting *Brendlin v. California,* ___ U.S. ___, 127 S.Ct. 2400, 2409 (2007)).

      In the instant case, Mr. Hightower was clearly seized. As the Second Circuit has stated:

> The standard test for what constitutes a seizure was first articulated by Justice Stewart in *United States v. Mendenhall,* 446 U.S. 544, 551-57 (1980), and adopted by the full Court in *INS v. Delgado,* 466 U.S. 210, 215 (1984). The police can be said to have seized an individual "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave," *Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877. *We have held that when an officer "'even briefly detains an individual and restrains that person's right to walk away', he has effected a seizure and the limitations of the Fourth Amendment become applicable." United States v. Moreno,* 897 F.2d 26, 30 (2d Cir. 1990); (citing *United States v. Sugrim,* 732 F.2d 25, 28 (2d Cir.1984)).

*Posr v. Doherty*, 944 F.2d 91, 97 (2d Cir. 1991) (emphasis added).

      Finally, the government attempts to sidestep the issue of the illegality Mr. Hightower's initial stop by focusing on Mr. Hightower's subsequent actions. However, since the initial stop was not justified, none of Mr. Hightower's following actions can supply the necessary reasonable suspicion. By arguing otherwise, the government does not take the Second Circuit's holding in *United States v. Swindle* in to account:

> The rule is therefore clear that an illegal stop cannot be made legal by incriminating behavior that comes after the suspect is stopped. And if subsequent incriminating events cannot justify an unreasonable stop, then it logically follows that subsequent incriminating events should not be able to justify an unreasonable *order* to stop.

407 F.3d 562, 568 (2d Cir. 2005).

---

gun cases raises questions about police tactics. Benjamin Weiser, *Police in Gun Searches Face Disbelief in Court*, N. Y. TIMES, May 12, 2008 (attached as Exhibit A).

Honorable Victor Marrero
May 13, 2008
Page 3 of 3

     Therefore, for all the reasons listed above, any evidence obtained as a result of the unconstitutional stop of Mr. Hightower must be suppressed.

Respectfully submitted,

IRA D. LONDON


cc:    A.U.S.A. Jeff Alberts
       Randy Hightower

The New York Times                                                                                          Page 1 of 6
May 12, 2008

# Police in Gun Searches Face Disbelief in Court

By **BENJAMIN WEISER**

After listening carefully to the two policemen, the judge had a problem: He did not believe them.

The officers, who had stopped a man in the Bronx and found a .22-caliber pistol in his fanny pack, testified that they had several reasons to search him: He was loitering, sweating nervously and had a bulge under his jacket.

But the judge, John E. Sprizzo of United States District Court in Manhattan, concluded that the police had simply reached into the pack without cause, found the gun, then "tailored" testimony to justify the illegal search. "You can't have open season on searches," said Judge Sprizzo, who refused to allow the gun as evidence, prompting prosecutors to drop the case last May.

Yet for all his disapproval of what the police had done, the judge said he hated to make negative rulings about officers' credibility. "I don't like to jeopardize their career and all the rest of it," he said.

He need not have worried. The Police Department never learned of his criticism, and the officers — like many others whose word has been called into question — faced no disciplinary action or inquiry.

Over the last six years, the police and prosecutors have cooperated in a broad effort that allows convicted felons found with a firearm to be tried in federal court, where sentences are much harsher than in state court. Officials say the initiative has taken hundreds of armed criminals off the street, mostly in the Bronx and Brooklyn, and turned some into informers who have helped solve more serious crimes.

But a closer look at those prosecutions reveals something that has not been trumpeted: more than 20 cases in which judges found police officers' testimony to be unreliable, inconsistent, twisting the truth, or just plain false. The judges' language was often withering: "patently incredible," "riddled with exaggerations," "unworthy of belief."

The outrage usually stopped there. With few exceptions, judges did not ask prosecutors to determine whether the officers had broken the law, and prosecutors did not notify police authorities about the judges' findings. The Police Department said it did not monitor the rulings and was aware of only one of them; after it learned about the cases recently from a reporter, a spokesman said the department would decide whether further review was needed.

http://www.nytimes.com/2008/05/12/nyregion/12guns.html?ei=5070&en=9d7e3fc6ad02ce84&ex=1211256000&emc=eta1&pagewanted=print

**The New York Times**  <span style="float:right">Page 2 of 6</span>
**May 12, 2008**

Though the number of cases is small, the lack of consequences for officers may seem surprising, given that a city commission on police corruption in the 1990s pinpointed tainted testimony as a problem so pervasive that the police even had a word for it: "testilying."

And these cases may fuel another longtime concern that flared up again in recent days: suspicions that the police routinely subject people to unjustified searches, frisks or stops. Last week, the Police Department reported a spike in street stops, which it said were "an essential law enforcement tool": 145,098 from January through March, more than during any quarter in six years.

The judges' rulings emerge from what are called suppression hearings, in which defendants, before trial, can argue that evidence was seized illegally. The Fourth Amendment sets limits on the conditions that permit a search; if they are not met, judges must exclude the evidence, even if that means allowing a guilty person to go free.

Prosecutors and police officials say many of the suppressions stem from difficult, split-second judgments that officers must make in potentially dangerous situations about whether to search someone for a weapon — decisions that are not always easy to reconstruct in a courtroom.

But one former federal judge, John S. Martin Jr., said the rulings are meant to deter serious abuses by the police. "The reason you suppress," he said, "is to stop cops from going up to people and searching them when they don't have reason."

Federal judges rarely suppress evidence, Judge Martin said, and the unusual number of suppressions in New York City gun cases raises questions about whether such tactics may be common. "We don't have the statistics for all the people who are hassled, no gun is found, and they never get into the system," he said.

Whatever one makes of the legal debate, these cases offer a revealing glimpse into some police practices — in the street and on the witness stand — that have gone largely unexamined outside the courtroom.

'A Dismal Record'

In one case, the officer explained that he had a special technique for detecting who was hiding a gun. He had learned it from a newspaper article that described certain clues to watch for: a hand brushing a pocket, a lopsided gait, a jacket or sweater that seems mismatched or out of season.

That was one reason, he told a judge, that he was certain the man he saw outside a Brooklyn housing project last September was concealing a gun. The man, Anthony McCrae, had moved his hand along the front of his waistband, as if moving a weapon, the officer said. Sure enough, a search turned up a gun.

http://www.nytimes.com/2008/05/12/nyregion/12guns.html?ei=5070&en=9d7e3fc6ad02ce84&ex=1211256000&emc=eta1&pagewanted=print

**The New York Times**                                                                                                      Page 3 of 6
**May 12, 2008**

The judge, John Gleeson of Brooklyn federal court, asked the officer, Kaz Daughtry, how successful his method had been in other cases.

Officer Daughtry replied that over a three-day period, he and his partner had stopped 30 to 50 people. One had a gun.

Calling that a "dismal record," the judge said the officer's technique was "little more than guesswork."

Moreover, Judge Gleeson said he did not believe that Officer Daughtry could even have seen the gesture he found so suspicious: Mr. McCrae's hand was in front of him and the officer was about 30 feet behind.

The judge would not allow the gun as evidence, and on April 24, federal prosecutors dropped the charges. A law enforcement official said the Brooklyn district attorney's office learned of the ruling and was reviewing Officer Daughtry's other cases to see if there were problems.

The Police Department declined to make Officer Daughtry, or any other officers, available for comment.

The decisions to suppress, which The New York Times found by interviewing lawyers and examining more than 1,000 court dockets since 2002, came from 18 federal judges in Manhattan and Brooklyn.

Several rulings involved police raids on homes without warrants — and judges' doubts that the owners had consented to a search, as the police claimed and the law requires.

In one case, a group of officers investigating a fatal shooting in 2002 entered an apartment in the Bronx and arrested a man named Justice Taylor after finding a shotgun in a bedroom. Sgt. Brian Branigan, who led the search, testified in federal court in Manhattan that Mr. Taylor had given the officers permission to enter.

But Mr. Taylor denied that. Two other officers did not mention his giving consent. And the judge, Jed S. Rakoff, said that Sergeant Branigan "felt the need to embellish his account with details indicating consent that the court finds unbelievable."

Judge Rakoff even took issue with the demeanor of the sergeant, "whose cockiness was evident even on the stand." His apparent "disregard for niceties," the judge wrote, made it "wholly plausible" that he had forced his way into the apartment.

The case was dismissed, and the city, while denying liability, paid $280,000 to settle a civil rights lawsuit by Mr. Taylor and others in the apartment.

http://www.nytimes.com/2008/05/12/nyregion/12guns.html?ei=5070&en=9d7e3fc6ad02ce84&ex=1211256000&emc=eta1&pagewanted=print

**The New York Times**                                                         Page 4 of 6
**May 12, 2008**

In another case, a judge did more than cast doubt on an officer's testimony. She proved it wrong.

The judge, Laura Taylor Swain, heard the officer, Sean Lynch, testify that he had shined his flashlight through the window of a parked sport utility vehicle one night in the Bronx and had seen a gun. The driver's lawyer said that Officer Lynch could not have seen the gun because the car's windows were heavily tinted.

So after sunset one evening in January 2006, the judge walked outside the Manhattan federal courthouse and shined a flashlight into the vehicle. She could see nothing.

Her inspection and other evidence, she wrote, "give the lie" to Officer Lynch's account, which she called "impossible." Prosecutors dropped the case.

The police, to be sure, have a difficult job trying to root out guns without overstepping the law. Some judges acknowledged this in court, saying they believed not that officers had lied, but rather that they had failed to recall an event accurately, perhaps because of its brevity, a limited vantage point or the subsequent passage of time.

And some expressed sympathy for the police. Judge Gleeson said in one case that while he found two officers' testimony contradictory, he did not want to imply they had lied.

"I'm always reluctant in these circumstances, having been in the executive branch myself, having a feel for the consequences of an adverse credibility determination — I'm sensitive to it," he said last November.

Judges typically do not discuss cases, but some have said that, in general, it is not their responsibility to follow up their criticisms of officers. The rulings are on the record, for prosecutors or others to act on if they wish.

Paul J. Browne, the Police Department's chief spokesman, said that only one of the critical rulings had been reported to the police, by a federal prosecutor in Brooklyn who said he had no doubts about the officer's truthfulness. The police took no action.

More broadly, Mr. Browne said an officer's failure to convince a judge that his suspicions were justified "doesn't necessarily mean the officer did something wrong."

"In each case," he added, "the suspect in fact had a gun."

Federal prosecutors would not comment on individual cases. But Michael J. Garcia, the United States attorney in Manhattan, said his office reviews any negative rulings about an officer's credibility to decide whether any action is necessary.

http://www.nytimes.com/2008/05/12/nyregion/12guns.html?ei=5070&en=9d7e3fc6ad02ce84&ex=1211256000&emc=eta1&pagewanted=print

**The New York Times**                                                                  Page 5 of 6
**May 12, 2008**

"Any time evidence gets suppressed is a serious thing," he said.

In court, prosecutors have vigorously defended the officers' conduct and testimony. In one brief, a prosecutor argued that a police lieutenant had no reason to lie, because that could "jeopardize a fast-moving N.Y.P.D. career." But writing in response, a federal defender, Deirdre von Dornum, cited cases in which officers faced no repercussions — "not the loss of their jobs, not disciplinary action."

Still, one judge was so struck by what he said were an officer's lies that he tried to do something about it.

Two officers had arrested a man and confiscated a gun in a Bronx apartment in 2002. But Judge Martin, then on the Manhattan federal court, was troubled that one officer had given the district attorney's office an account of how she gained entry to the apartment, then largely contradicted it on the stand.

"This has to be one of the most blatant cases of perjury I've seen," Judge Martin, a former United States attorney, said in his courtroom in September 2003. He said he doubted the officer, Kim Carillo, had "any use for the truth."

"She will tell it, I think, whatever way it suits her to tell it," he added.

The judge told the prosecutor to ask his superiors to review Officer Carillo's testimony. They later replied that they had found no perjury, he said, and that the officer was not at fault.

Side Effects

If the fallout for police officers has been slight, the judges' rulings have exacted other costs.

For one thing, they may free a weapons offender, and scuttle the chance to win his cooperation in more significant prosecutions, like investigations into violent gangs or gun trafficking. "The lost value of those bigger cases is really incalculable," said Alan Vinegrad, a former United States attorney in Brooklyn.

Questions about police credibility can also hamper other cases. When a judge finds, for example, that an officer has lied, prosecutors must alert defense lawyers in other cases involving that officer.

Judge David G. Trager of Brooklyn federal court was so indignant over what he called an officer's "blatantly false" testimony in an October 2005 suppression hearing that he told prosecutors, "I hope you won't darken my courtroom with this police officer's testimony again."

http://www.nytimes.com/2008/05/12/nyregion/12guns.html?ei=5070&en=9d7e3fc6ad02ce84&ex=1211256000&emc=eta1&pagewanted=print

**The New York Times**                                                     Page 6 of 6
**May 12, 2008**

Judge Trager did not suppress the gun, concluding that some of the officer's testimony had been credible. But the officer, Herbert Martin, was about to testify in a federal trial stemming from another gun arrest.

The defense lawyer in that case, Howard Greenberg, said that learning of Judge Trager's findings "was like manna from heaven."

When Officer Martin took the stand in that trial, Mr. Greenberg confronted him, asking, "Didn't you commit perjury a week ago when you said in this very building, in an altogether different case, that someone had a gun in his waist?"

The officer denied that he had lied. But Mr. Greenberg said he believed that his question made an impression on the jury. His client was acquitted.

http://www.nytimes.com/2008/05/12/nyregion/12guns.html?ei=5070&en=9d7e3fc6ad02ce84&ex=1211256000&emc=eta1&pagewanted=print